1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROBERT JAMES ROARK,

           Plaintiff,

      v.

RICHARDSON BAY REGIONAL
AGENCY, et al.,

           Defendants.

Case No.  22-cv-07610-WHO

**ORDER GRANTING MOTION TO
DISMISS**

Re: Dkt. No. 41

      Plaintiff Robert James Roark has brought a broad array of constitutional and other claims

challenging defendant Richardson's Bay Regional Agency's ("RBRA") "Anchoring Permit

Scheme" ("Permit Scheme") and the December 2022 issuance of a "Notice to Remove" his boat,

the Kittiwake, for failure to comply with the Permit Scheme.  I denied without prejudice RBRA's

prior motion to dismiss the First Amended Complaint ("FAC") and invited it to file a more

comprehensive motion that addressed the substance of each of Roark's claims.  Dkt. No. 37.[1]  It

did so.  Because Roark has not alleged facts that plausibly support his claims, and because the law

is so clear that an amendment would be futile, I GRANT defendants' motion to dismiss without

leave to amend.

## BACKGROUND

      As noted in my prior Order, Roark's FAC challenges the constitutionality of the Permit

Scheme under the Fourth, Fifth, Eighth and Fourteenth Amendments because:[2]

      (i)       the Permit Scheme is "impossible to comply with" and "subjects Plaintiff to

---

[1] The pleadings opposing the requests for temporary restraining orders were filed on behalf of
defendants RBRA, James Malcolm, and Steven McGrath.  Dkt. No. 12.  The prior motions to
dismiss were filed on behalf of defendant RBRA only.  Dkt. Nos. 19, 29.  The pending motion to
dismiss was filed on behalf of defendants RBRA and James Malcolm.  Dkt. No. 41.  Throughout
the pleadings in this case, and in the public agency records and RBRA Code, the bay at issue is
referred to as both Richardson's Bay and Richardsons' Bay.  The same documents refer to Harbor
Master and Harbormaster.  In this Order, I will use Richardson's Bay and Harbor Master.

[2] The Permit Scheme is outlined in the RBRA Agency Code ("Code") attached to Roark's FAC at
Ex. H-2 [Dkt. No. 25-10], and the Permit Application at issue is attached to Roark's FAC as Ex. H
[Dkt. No. 25-8].

constant threat" of the loss of his boat and civil or criminal prosecution;

(ii)     the Permit Scheme unconstitutionally allows warrantless searches in violation of the Fourth Amendment;[3]

(iii)    the Permit Scheme violates the Due Process Clause and Fifth Amendment Takings Clause because the permits can be revoked at any time without due process;[4]

(iv)    the Permit Scheme unconstitutionally requires permit applicants to "waive" all right to damages from RBRA's actions;[5]

(v)     the Permit Scheme requires permit applicants to swear under penalty of perjury facts that could be used against them in criminal proceedings;[6] and

---

[3] FAC ¶ 108, citing Permit Application pg. 1: "the RBRA harbormaster is authorized to inspect the vessel at any time to enforce compliance with the permit.  Any vessel this [sic] is found to be out of compliance with the conditions listed below may be cited, have its permit revoked, and forced to leave the anchorage"; pg. 2: "Emergency inspections of unattended vessels will be conducted whenever a vessel appears to be in, or is likely to create distress or potential to other vessels, real property or the environment."

[4] See FAC ¶ 111,  citing Permit Application pg. 1: "Any vessel that is found to be out of compliance with the conditions listed below may be cited, have its permit revoked, and forced to leave the anchorage"; pg. 3: "[i]f a violation occurs, the vessel will immediately be required to leave the anchorage"; pg. 3: "[a]ny vessel anchoring in contravention to these rules, or in neglect of any precaution which may be required by the ordinary practice of seamen, will be required to move immediately when requested to do so by the RBRA and may be subject to citation and immediate cancellation of this permit."

[5] See FAC ¶ 116, citing Permit Application pg. 3: "The permittee shall be liable for any loss or damage to person or property caused by or on behalf of the permittee.  Furthermore, the permittee agrees to be responsible to the RBRA and to pay for any or all loss or damages to piers, floats, or other public or private facilities caused by permittee [] whether caused by negligence or not, and further to defend and hold the RBRA [] harmless for any of the foregoing"; pg. 3: "[i]t is expressly agreed that the RBRA shall not be liable for loss or damage to any property left or stored by permittee or any other person in or upon the vessel or boat in RBRA/public waters or bay bottom, and permittee waives any and all claims for such loss or damage against the RBRA and agrees to hold the RBRA harmless from and against any such claims"; pg. 3: "[t]he permittee, for themselves, their assigns [] hereby release and agree to hold harmless the RBRA, their assigns [] for any liability for personal injury, loss of life and/or property damages of any kind whatsoever."

[6] See FAC ¶¶ 122-137, citing numerous provisions of the RBRA Code providing authority to the Harbor Master to issue citations, making violation of code provisions an infraction that if occurring three times in a twelve-month period rises to a misdemeanor, and requiring vessels in anchored to Richardson's Bay to be seaworthy and operable.  Roark also argues that because the Permit Application requires applicants to declare under penalty of perjury that the vessel is safe, seaworthy, registered, and has operable tackle, lights, and signals, the Permit Scheme violates the right against self-incrimination.

United States District Court
Northern District of California

1

(vi)      the Permit Scheme places permit applicants or those without permits in the

2  unconstitutional position of facing "persistent criminal liability."[7]

3  *See* FAC ¶¶ 78-79, 97-146 & Ex. H.

4         Roark further alleges that a June 2021 Notice identifying his boat as marine debris

5  ("Marine Debris Notice") and his subsequent "displacement" by the RBRA violated his Fourth,

6  Fifth, and Fourteenth Amendment rights.  FAC ¶¶ 71-72, 284-326 & Ex. C.  He contends that

7  RBRA and others have conspired to take his boat and defraud the State of California in violation

8  of the Fifth and Fourteenth Amendment based on two "separate grant contracts" entered into in

9  December 2020 and December 2021.  FAC ¶¶ 65-71, 175-234, 260-283, 327-335, 389-417 & Exs.

10  A, B (listing the Kittiwake in the scope of work for destruction).  He alleges that these contracts,

11  as well as defendants' intent to destroy his boat shown by the contracts, were concealed from and

12  never disclosed to plaintiff or the public.  FAC ¶ 185.  He states that this conduct violates

13  California Civil Code sections 526(a) & 1085.  FAC ¶¶ 409-431.  Finally, he asserts a claim for a

14  constitutional violation under California's Bane Act (Cal. Civ. Code § 52.1) and for declaratory

15  and compensatory relief for "past and present constitutional violations." FAC ¶¶ 442, 443.

16         Roark's allegations of false claims or false statements made to secure state funds from the

17  California Department of Boating and Waterways (CDBW, "Cal Save Grants") or federal funds

18  from the National Oceanic Atmospheric Administration ("NOAA") form the basis at least in part

19  of the following causes of action:  the Third Cause of Action ("42 U.S.C. § 1985 Conspiracy to

20  Violate Substantive Due Process," alleged against unserved defendants Lesberg, Coastal Policy

21  Solutions, and RBRA); the Fourth Cause of Action ("Violation Public Contract" against unserved

22  defendants Pollard and Havel, based on misuse of federal funds from the NOAA, the Ocean

23  Protection Council, and CDBW); the Fifth Cause of Action ("Violation of 42 U.S.C. § 1983, §

24  1985 Violation of Substantive Due Process," based on claims that false or fraudulent claims were

25  submitted to NOAA; the Fifteenth Cause of Action ("Violation of California False Claims Act,"

26  based on fraudulent claims made to CDBW to secure Cal Save Grants); and the Nineteenth Cause

27

28  [7] *See id.*

1    of Action ("Taxpayer Action" based on false claims submitted to CDBW).  These claims all rely

2    on allegations that various defendants made false claims to state and federal agencies for the

3    purpose of securing funds under the pretense or intent to destroy the Kittiwake.

4         In response to defendants' renewed motion to dismiss the FAC, Roark submitted a notice

5    voluntarily dismissing his "Causes of action under the False Claims Act and the California False

6    Claims Act."  Dkt. No. 43.  In an abundance of caution, I will consider Roark's voluntary

7    dismissal as applying *only* to the Fifteenth Cause of Action, entitled "Violation of California False

8    Claims," and DISMISS it with prejudice.  I address defendants' challenges to Roark's remaining

9    causes of action in turn.

10                              **LEGAL STANDARD**

11        Under FRCP 12(b)(6), a district court must dismiss a complaint if it fails to state a claim

12   upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must

13   allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v.*

14   *Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts

15   that "allow the court to draw the reasonable inference that the defendant is liable for the

16   misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must

17   be "more than a sheer possibility that a defendant has acted unlawfully."  *Id*.  While courts do not

18   require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a

19   right to relief above the speculative level."  *Twombly*, 550 U.S. at 555, 570.

20        In deciding whether the plaintiff has stated a claim upon which relief can be granted, the

21   Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the

22   plaintiff.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court

23   is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

24   fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir.

25   2008).  If the court dismisses the complaint, it "should grant leave to amend even if no request to

26   amend the pleading was made, unless it determines that the pleading could not possibly be cured

27   by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making

28   this determination, the court should consider factors such as "the presence or absence of undue

United States District Court
Northern District of California

1   delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments,

2   undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport*

3   *Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

4

5   **I.     CONSTITUTIONAL RIGHT TO ANCHOR**

6           Defendants contend that underlying the whole of Roark's FAC is an assertion that Roark

7   has a constitutional right to anchor in Richardson's Bay. *See* Mot. at 4-5 (citing ¶¶ FAC 106, 113,

8   144). I do not agree that every claim in Roark's FAC depends on that assertion. But I agree that

9   to the extent Roark *is* alleging a stand-alone constitutional entitlement to anchor where he chooses,

10  the United States' constitution does not confer a blanket right to anchor in Richardson's Bay. *See*

11  *Graf v. San Diego Unified Port Dist.*, 7 Cal. App. 4th 1224, 1232 (1992) ("Boaters do not have a

12  constitutional right to unregulated long-term anchorage in public navigable waters.").

13  **II.    PREEMPTION**

14          Defendants also contend that throughout the FAC Roark argues or implies that RBRA's

15  anchorage ordinance is preempted by federal law. *See, e.g.*, FAC ¶ 145 ("anchoring permit

16  application violates the Supremacy Clause because it effectively bans all anchoring within the

17  federally designated anchorage outlines in 33 C.F.R. 110.126(a)"). I agree that no regulation or

18  federal authority identified by Roark preempts the authority of RBRA to control anchorages in

19  Richardson's Bay. Instead, the federal regulations he identified establish Richardson's Bay as a

20  "special anchorage area" and direct mariners to comply with the RBRA's Permit Scheme.[8]

21  Significantly, the Ninth Circuit has expressly rejected the argument that the special anchorage

22  ―――――――――――――――

23  [8] Roark cites to various federal regulations in his FAC. The regulations that he alludes to in
    support of preemption include 33 C.F.R. § 110.126a, that classifies Richardson's Bay as a "special

24  anchorage" and noting that "Mariners anchoring in the special anchorage area should consult
    applicable ordinances of the Richardson Bay Regional Agency and the County of Marin. These

25  ordinances establish requirements on matters including the anchoring of vessels, placement of
    moorings, and use of anchored and moored vessels within the special anchorage area. Information

26  on these local agency requirements may be obtained from the Richardson Bay Harbor
    Administrator." He also relies on 33 C.F.R. § 109.10, that provides "for the designation of special

27  anchorage areas wherein vessels not more than sixty-five feet in length, when at anchor, will not
    be required to carry or exhibit anchorage lights. [ ] The areas so designated should be well

28  removed from the fairways and located where general navigation will not endanger or be
    endangered by unlighted vessels."

United States District Court
Northern District of California

designations conflict with local ordinances requiring permits to stay beyond 72 hours. *See Barber v. State of Hawai'i*, 42 F.3d 1185, 1191 (9th Cir. 1994) (the "requirement that vessels in excess of 65 feet anchored in Ke'ehi Lagoon must exhibit white lights while at anchor does not conflict with Hawaii's regulations, which simply require that boats in the lagoon obtain a permit and moor in a designated area if the boat is to remain in the lagoon for more than 72 hours."); *see also Graf v. San Diego Unified Port Dist*., 205 Cal. App. 3d 1189, 1193 (Cal. Ct. App. 1988) ("Thus the jurisdiction to establish and enforce the anchorage and nonanchorage areas in San Diego Harbor is concurrent" between the federal government and the local body delegated with authority).

Any cause of action or theory based on preemption is DISMISSED without leave to amend.

## III.    PROCEDURAL DUE PROCESS CLAIM

Defendants move to dismiss Roark's procedural due process claim in the First Cause of Action, where he challenges the lack of an appeal process when RBRA revokes a 30-day anchoring permit ("Permit") because a vessel is out of compliance with the conditions required by the Permit Application.  FAC ¶¶ 110, 190; *see also* Permit Application pg. 2 (identifying conditions required for vessels to secure or maintain a Permit).  Because no fundamental property interest is implicated, there is no procedural due process violation.

A plaintiff asserting a section 1983 claim based on procedural due process must show: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process."  *See Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).  "An elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 306, 314 (1950).  Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Id*. at 314.

In addition to notice, "[o]rdinarily, due process of law requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest." *Memphis Light, Gas,*

*and Water Div. v. Craft*, 436 U.S. 1, 19 (1978).  However, a pre-deprivation hearing is not required where the loss may not be "serious," where the government has procedures to "minimize the risk of erroneous determination," where the deprivation is foreseeable, or where provision of a pre-deprivation hearing is "impractical" given exigent circumstances. *Weinberg v. Whatcom Cnty.*, 241 F.3d 746, 753–54 (9th Cir. 2001).

Defendants argue that Roark lacks standing to bring a procedural due process claim because he has not applied for a Permit (Mot. at 8-9) and admits that he intends to live on his boat in Richardson's Bay, which is not allowed under RBRA Code §3.04.020 and means that he would be denied a Permit. *See* Mot. at 8-9; RBRA Code 3.04.020 ("Living aboard a houseboat or vessel anchored or moored in Richardson's Bay is prohibited.  The Harbor Master may issue a permit to transient vessel to anchor in the designated anchorages for more than 72 hours, provided that the Harbor Master determines that no permanent residential use is intended.  In such cases, the Harbor Master shall issue a permit valid for 30 days.  This permit may be renewed for two additional 30 days periods at the Harbor Master's discretion.").

Roark alleges and defendants do not dispute that Malcom and RBRA posted at least one Notice of Removal on the Kittiwake because Roark had not secured a Permit.  Both sides also admit that defendants provided Roark with a Permit Application and suggested he apply.  *See, e.g.*, Compl. ¶¶ 79-83.  Roark alleges that he filled out part of the Permit Application but that he objected to some of the conditions and returned it to defendants with the provisions he objected to crossed out.  *Id.* ¶¶ 86-87, Ex. I.  The RBRA rejected Roark's proposed changes.  *Id.* ¶ 89.  Given these undisputed allegations regarding Roark's attempt to apply for a Permit at defendants' urging, defendants' argument that he lacks standing to challenge the provisions is not well taken.

On the merits of the claim, defendants contend that adequate process is provided under the RBRA Code as a matter of law because:

- Any person administratively cited for violating RBRA code is entitled to procedural protections including notice, service, an opportunity to appeal the citation to a neutral hearing officer, and an additional opportunity to appeal the administrative decision to the Superior Court. RBRA Code § 1.04.050.

- In the event that a vessel is impounded, the owner has an opportunity to claim and retrieve the vessel. RBRA Code § 4.05.010.

- The RBRA code outlines the procedures for declaring a vessel anchored in Richardson's Bay without a permit to be a nuisance, including providing notice, service, and an opportunity to appeal the decision. RBRA Code §§ 6.04.040, 6.04.060.

Mot. at 9. Review of the sections identified by the RBRA, however, do not fully match defendant's descriptions. RBRA Code section 1.04.050 outlines the penalties allowed under the Code. RBRA Code section 4.05.010 allows the Harbor Master to remove or impound any vessel "found" in violation of the Code provisions, and gives owners an opportunity to claim and retrieve impounded vessels. RBRA Code sections 6.04.010 *et seq.* (including 6.04.040 and 6.04.060), govern abatement of identified nuisances. Those sections require notice to vessel owners if vessels are determined to be public nuisances (for identified reasons, *see* §6.04.020) and allow the owner to either abate the nuisance or appear before the RBRA Board to contest the nuisance designation. The form of notice required by section 6.04.050 of the RBRA Code must identify the conditions creating the nuisance that needs to be abated and also inform the vessel's owner that she can appear at an identified RBRA Board meeting to contest the negligence determination. *See* RBRA Code 6.04.050.

These provisions do not, on their face, appear to apply to the challenge Roark makes to the *revocation* of 30-day anchoring permits without a pre-deprivation hearing. Nor is the form of notice identified in section 6.04.050 similar to the Notice to Remove given to Roark. *Compare* Dkt. No. 25-10 at ECF pg. 15 *with* Dkt. No. 35-6 (December 2022 Notice to Remove).[9] It appears that there is no opportunity given to 30-day Permit holders to contest and be heard when RBRA revokes a 30-day permit.

That does not mean that Constitutional rights have been violated, however. Constitutional

---

[9] When asked at oral argument about what appeal process is provided, if any, for the 72-hour Notices to Remove for vessels that have not secured a Permit or presumably ones where the Permit has been revoked, defense counsel stated that recipients can "appeal" the Notices. However, no information regarding methods by which recipients can appeal the Notice to Remove is included on the Notice itself. *See* Compl. Ex. F [Dkt. No. 25-6].

United States District Court
Northern District of California

procedural due process rights attach only when a fundamental property right has been implicated. As noted above, there is no constitutional right to anchor in Richardson's Bay.  *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.").  The question, then, is whether a 30-day Permit involves the type of protected property interest that would require a pre-deprivation hearing before it was revoked.  *See Weinberg v. Whatcom Cnty*., 241 F.3d 746, 753 (9th Cir. 2001) (issued building "permits and approved plats are analogous to a driver's licence, which the Washington Supreme Court recognized to be the subject of a valid property interest," and therefore pre-deprivation notice and opportunity to be heard was required before the permit could be invalidated).

Neither side has provided authority regarding this issue under California law, but a 30-day Permit – that provides only a temporary, limited-in-time ability to anchor in RBRA if the vessel is maintained according to the Permit's requirements – is facially not the type of "property interest" to which pre-deprivation hearing rights attach.  As the California Court of Appeal explained in *Calvert v. Cnty. of Yuba*, 145 Cal. App. 4th 613, 622–23 (2006), *as modified* (Jan. 3, 2007), permits that are issued for "typical, small scale" building projects involve "ministerial decisions" typically based on "certain fixed standards and objective measurements."  Given the ministerial nature of the permitting process, the revocation of those types of permits falls outside the realm of procedural due process, at least in terms of pre-deprivation hearings.[10]  The time-limited 30-day Permit allowed under the Permitting Scheme is similarly limited in time and can be issued only if certain fixed standards are met.

Roark's procedural due process challenge to the Permit Scheme is DISMISSED without leave to amend.

---

[10] Read generously, Roark also contends that the Permit Application's requirement that permittees waive their right to seek damages against the RBRA is an "unconstitutional waiver" of his due process rights to challenge the deprivation of "property and rights."  FAC ¶ 120.  That allegation is addressed below with respect to Roark's Takings Claim.

United States District Court
Northern District of California

United States District Court
Northern District of California

### IV.   SUBSTANTIVE DUE PROCESS

Defendants move to dismiss Roark's Sixth Cause of Action alleging a "Substantive Due Process" violation of 42 U.S.C. section 1983 for "Mail Fraud." FAC ¶¶ 260-279. Roark alleges a violation of "substantive due process" under his Eleventh Cause of Action as well. *Id*. ¶¶ 327-335 The bases for the mail fraud and substantive due process causes of action are the same; Roark alleges that RBRA falsely identified the Kittiwake as an abandoned vessel and thereby secured grant funding under the Cal Save Grant from CDBW to target the Kittiwake for destruction.

"Substantive due process 'forbids the government from depriving a person of life, liberty, or property in such a way that "shocks the conscience" or "interferes with the rights implicit in the concept of ordered liberty."'" *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (quoting *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998)); *United States v. Salerno*, 481 U.S. 739, 746 (1987); *see also Brittain v. Hansen*, 451 F.3d 982, 990-91 (9th Cir. 2006). "Substantive due process is ordinarily reserved for those rights that are 'fundamental.'" *Id*. at 990 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721-22 (1997)).

Roark alleges that defendants Havel and Pollard (who have not apparently been served and who have not appeared in this case but who in the past worked for RBRA), RBRA, Malcom and another unserved defendant (Brad Gross) deprived Roark of substantive due process when they used the mails in 2020 and 2021 to apply to CDBW for grants to destroy the Kittiwake and defraud CDBW by falsely stating the Kittiwake was an abandoned derelict vessel. *Id*. ¶¶ 260-275, 327-335. Roark separately alleges that defendant Malcom "demanded" that Roark seek an anchoring permit (when that the permit would have required Roark to waive his rights to damages if his boat were illegally seized) and did not disclose that RBRA already had a "contract" from CDBW to seize and destroy the Kittiwake. By doing this, Roark alleges that Malcolm was attempting to "fraudulently induce" him to waive his right to damages "so that the RBRA could execute its fraudulent contract with impunity." *Id*. ¶¶ 276-279.

RBRA argues that Roark has failed to identify facts showing that defendants interfered or attempted interfere with any of his protected "fundamental liberty" interests through mail fraud. Even if those facts had been adequately alleged, RBRA asserts that Roark cannot state a claim for

1    damages based on mail fraud under Section 1983 because as Section 1983 protects only against

2    violations of civil rights not violations based on fraud.  RBRA is correct: under Section 1983,

3    Roark can seek relief only for deprivation of rights secured by the constitution, not for allegations

4    of fraud or mail fraud.

5         In opposition, Roark clarified his substantive due process theory.  He contends that

6    defendants' fraudulent use of the mails to secure CDBW grants to destroy the Kittiwake (despite

7    the Kittiwake not being an abandoned vessel) is conduct that "shocks the conscience" in violation

8    of his due process rights.  He further alleges that Malcom's purpose in directing Roark to secure a

9    permit in December 2022, while not disclosing the existence of the grants to destroy the

10   Kittiwake, was to force Roark to waive his right to damages against RBRA once the Kittiwake

11   was seized and destroyed.   Opposition [Dkt. No. 42] at 6-8.

12        Conduct that shocks the conscience, however, must be more than mere negligence, but

13   must be "so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and

14   decency."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (internal quotations omitted).

15   Neither of Roark's theories rises to the level of abusive government acts that could shock the

16   conscience.

17        First, defendants' listing the Kittiwake as a potentially abandoned vessel that could be

18   destroyed using Cal Grant funds, and failing to disclose the listing to Roark, does not rise to the

19   level of mail fraud or governmental conduct that shocks the conscience.  Roark attaches as Exhibit

20   A and B to his Amended Complaint the CDBW "Grant Agreements – Certificates of Funding."

21   Dkt. Nos. 25-1 & 25-2.  Those documents show that RBRA was authorized to seek reimbursement

22   from state funds *if* RBRA took control of "abandoned" or surrendered vessels and had them

23   destroyed.  *Id*., Section 1 "PURPOSE OF THE PROGRAM."  If vessels are destroyed, RBRA

24   then had to seek "reimbursement" following an identified claims process.  *Id*., Section 24

25   "BUDGET DETAIL AND PAYMENT PROVISIONS."  Because the program covers vessels that

26   might be "abandoned" but might also be voluntarily surrendered, that the RBRA listed the

27   Kittiwake as a vessel that was in Richardson's Bay and might be covered by that year's grant (*if* it

28   was seized or *if* it was voluntarily surrendered) does not support a charge of fraudulent activity by

United States District Court
Northern District of California

11

United States District Court
Northern District of California

RBRA or any individual defendant.  It is not legally significant  that the RBRA did not disclose to Roark that it listed the Kittiwake on the grant applications; there are a number of anchored vessels in Richardson's Bay that could potentially fall within the scope of the grant so it is logical that RBRA would list vessels that might potentially fall within the funding parameters for that year.

Second, for the same reasons, that Malcom encouraged Roark to seek a 30-day Permit at the same time that the Kittiwake was listed on the grant applications does not support a claim or mail fraud or "shock the conscience" behavior.  The RBRA was simply seeking the maximum possible funds in case the Kittiwake or other vessels in Richardson's Bay were seized under the RBRA's nuisance abatement powers or voluntarily surrendered.  There is no basis for a substantive due process claim related to RBRA identifying the Kittiwake as a vessel in its grant applications.[11]

In addition to the substantive due process allegations in his Fifth and Eleventh Causes of Action, under his First Cause of Action Roark alleges that the Permit Scheme violates Section 1983 because it "forces the mariner to waive their rights to due process of law for deprivation of property and rights."  FAC ¶ 114.  Roark's waiver argument is based on language in the Permit Application that:

> 11.    The permittee shall be liable for any loss or damage to person or property caused by or on behalf of permittee. Furthermore, the permittee agrees to be responsible to the RBRA and to pay for any or all loss or damages to piers, floats, or other public or private facilities caused by permittee, his or her agents, and/or employees whether caused by negligence or not, and further to defend and hold the RBRA, its agents and employees, harmless for any of the foregoing. This indemnification shall survive the expiration or termination of this agreement.
>
> 12.    It is expressly agreed that the RBRA shall not be liable for loss or damage to any property left or stored by permittee or any other person in or upon the vessel or boat in RBRA/public waters or bay

---

[11] Roark argues that his claims are similar to those raised in *Knight v. Richardson Bay Reg'l Agency*, 637 F. Supp. 3d 789 (N.D. Cal. 2022).  However, in *Knight* the question was whether the plaintiff had made a sufficient showing that his boat was not "marine debris" to temporarily enjoin RBRA from seizing his boat in potential violation of plaintiff's due process rights and rights under the Fourth Amendment.  The analysis there turned on the dispute of fact over whether the boat was "marine debris" and whether to stay enforcement of the existing Marine Debris Notice and the agency's efforts to seize the boat.  In this case, there is no pending Marine Debris Notice and no finding or survey (as in *Knight*) that the Kittiwake is still considered Marine Debris by RBRA.

> bottom, and permittee waives any and all claims for such loss or damage against the RBRA and agrees to hold the RBRA harmless from and against any such claims.
>
> 13.    The permittee, for themselves, their assigns', successor's and interests, legal representatives, their estate as the case may be, hereby release and agree to indemnify and hold harmless the RBRA, their assigns', successor's and interests, legal representatives for any liability for personal injury, loss of life and/or any property damage of any kind whatsoever.

Dkt. No. 25-8.  The first paragraph clearly covers damage that occurs as the result of the permittee's conduct or damage caused by the permittee's vessel.  The second paragraph addresses only loss of property stored in or on the vessel.  The third paragraph is a very broad indemnity claim that presumably relates to RBRA's granting the vessel owner the right to anchor in Richardson's Bay for 30 days.

I agree with Roark that the scope of the paragraph is unclear, but I cannot say that its presence in the Permit Application effects a violation of substantive due process because it requires permittees to "give up" all possible damage claims against RBRA.  Roark's facial constitutional challenge to the Permit Application can only succeed if Roark establishes "that no set of circumstances exists under which the [Permit Application] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).  While broad, the third indemnity paragraph serves obvious, legal purposes:  For example, where a permittee's vessel becomes unmoored and damages a third-party's vessel, requiring the permittee to indemnify the RBRA for damage to the third-party's vessel would be appropriate.  And there is no support for Roark's argument that by signing a Permit Application he would give up the right to seek damages from RBRA for conduct *unrelated* to the 30-day Permit, such as damage claims that either preexisted the Permit or occurred after the Permit expired, *i.e.*, if the RBRA unconstitutionally seizes or otherwise unreasonably takes his boat.

Roark's substantive due process challenge to the Permit Scheme is DISMISSED without leave to amend.

## V.    TAKINGS CLAIM

Defendants move to dismiss the takings claims Roark alleges in his First, Seventh, and Tenth Causes of Action.  Roark states these claims under different theories, based on : (1) an

United States District Court
Northern District of California

asserted right to anchor in Richardson's Bay that is taken away by the use of the notices and forcing vessels to leave or be seized; (2) posting of the two notices on Roark's boat; one declaring the Kittiwake marine debris and the other for failing to secure a permit, FAC ¶¶ 312-318; (3) the purported contract entered into between RBRA and CDBW to seize and destroy the Kittiwake, FAC ¶¶ 280-283; and (4) the Permit Application requiring permittees to waive rights to damages against RBRA for any unconstitutional takings.  FAC ¶¶ 115-119.

"A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick v. Township of Scott, Pa*., 139 S. Ct. 2162, 2167 (2019). "The government commits a physical taking when . . . the government physically takes possession of property without acquiring title to it." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (citing *United States v. Pewee Coal Co*., 341 U.S. 114, 115-17 (1951) (plurality)). This "sort[] of physical appropriation constitute[s] the 'clearest sort of taking,' and we assess [it] using a simple, per se rule: The government must pay for what it takes." *Id*. (first quoting *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001), then citing *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Regional Plan. Agency*, 535 U.S. 302, 322 (2002)). Additionally, "[i]ndividuals must receive notice and an opportunity to be heard before the Government deprives them of property." *Gremmels v. FDA*, No. 21-CV-06102-JSC, 2021 WL 7448539, at *2 (N.D. Cal. Oct. 5, 2021), report and recommendation adopted, No. 21-CV-06102-VC, 2021 WL 7448546 (N.D. Cal. Nov. 4, 2021) (quoting *United States v. James Daniel Good Real Prop*., 510 U.S. 43, 48 (1993)).

Roark's first theory is not cognizable because there is no constitutional right to anchor in Richardson's Bay, as discussed above.  He identifies no other source of a right to anchor in Richardson's Bay.  His third and fourth theories, based on the CDBW Grant Agreements and purported waiver of rights to seek damages, fail for the reasons discussed in Section IV, above, with respect to the substantive due process claims.  The defendants did not commit fraud or "shock the conscience" with their conduct.

His second theory fails because impoundments – like those contemplated by the Notice to Remove only if the vessel owner does not move their unpermitted vessel within 72 hours – are

permissible where allowed by law and where sufficient notice has been given, as it was here. *Clement v. City of Glendale*, 518 F.3d 1090, 1093 (9th Cir. 2008) ("The courts have long interpreted this—along with the parallel restriction on the federal government in the Fifth Amendment—to require that notice generally be given before the government may seize property."); *see also Deligiannis v. City of Anaheim*, No. SACV 06-720 DOC(JC), 2010 WL 1444538, at *8 (C.D. Cal. Mar. 2, 2010), *report and recommendation adopted*, No. SACV 06-720DOC(JC), 2010 WL 1444535 (C.D. Cal. Apr. 3, 2010), *aff'd*, 471 F. App'x 603 (9th Cir. 2012) (no takings claim where vehicle impounded for unpaid parking tickets, because "plaintiff's vehicle was not seized for a 'public use' in the context of the Takings Clause.").

There has been no impoundment and no taking here.  The posting of the Notice to Remove gives the vessel owner the option to remove the vessel or to face potential impoundment.  In and of itself, that is not an unconstitutional taking.  Roark contends that he may pursue his taking claims, even though an impoundment has not occurred, under the Supreme Court's decision in *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019).  Opposition at 3-4.  But that case stands for the proposition that once a taking *occurs*, a property owner may file a federal takings claim and need not exhaust state law processes.  It does not stand for the proposition that the government may be enjoined from taking property when there are procedures in place to provide just compensation for any eventual taking.  *Id*. at 2176 ("because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable. As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking.").

Roark's takings claim under the Fifth Amendment is DISMISSED without leave to amend.

## VI.    FIFTH AMENDMENT - SELF-INCRIMINATION

Roark alleges that the Permit Application violates the Fifth Amendment privilege against self-incrimination because it requires mariners to "declare facts, under penalty of perjury, that can foreseeably be used in criminal prosecution" and points to various provisions in the RBRA Code

United States District Court
Northern District of California

that provide for issuances of infractions up to the level of misdemeanors  FAC ¶¶ 121-137, 146.[12]
This claim lacks merit.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to
be a witness against himself." U.S. CONST., amend. V. "[T]his prohibition not only permits a
person to refuse to testify against himself at a criminal trial in which he is a defendant, but also
privileges him not to answer official questions put to him in any other proceeding, civil or
criminal, formal or informal, where the answers might incriminate him in future criminal
proceedings." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984) (internal quotations omitted).  To
establish a Fifth Amendment violation outside the context of a criminal trial, a person must prove
two things: (1) the testimony desired by the government carries real and appreciable danger of
self-incrimination in a future criminal prosecution; and (2) the testimony was compelled, *i.e.*, the
penalties suffered are sufficiently coercive and not hypothetical. *United States v. Antelope*, 395
F.3d 1128, 1134-39 (9th Cir. 2005) (citing *Minor v. United States*, 396 U.S. 87, 98 (1969) and
*Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977)).

Roark's claim fails because he cannot allege plausible facts that if he was to affirm, under
penalty of perjury, that his boat meets the health and safety requirements required for a 30-day
Permit, he faces a "real and appreciable danger" of self-incrimination "in a future criminal
prosecution."  Roark relies on the sections of the RBRA Code that provide the Harbor Master the
power to issue citations if boats are deemed to violate the Code or other regulations.  RBRA Code
§ 2.040.010(b).  He also relies on the section of the Code that states that where any individual "has
been convicted of violating the same ordinance three times in a twelve-month period" the "Agency
Attorney" may "elevate the current violation to a misdemeanor and prosecute it as such."  RBRA
Code §1.04.050(c).  But the substantive Code provisions Roark identifies are the independent
requirements that vessels anchored in Richardson's Bay be seaworthy, have adequate sanitation

---

[12] The Permit Application requires applicants to affirm "under penalty of perjury" that their vessel
meets certain requirements including: is "maintained in a neat and safe condition"; is "equipped
with operable and functioning sanitation equipment"; is "in seaworthy conditions"; is
appropriately registered; and has "operational navigation lights" among other requirements.
Permit Application pg. 2.

United States District Court
Northern District of California

facilities, and comply with other agency regulations.  *See* RBRA Code 1.040.020 ("Definitions,"

including "Operable" "Seaworthy"); 3.04.050 (:Vessel Condition and Requirements).  It is

violation of these provisions – not the statements under penalty of perjury required in the Permit

Application – that might subject vessel owners to citations or possible prosecution for

misdemeanors under the RBRA Code.  *See United States v. Drollinger*, 80 F.3d 389, 392 (9th Cir.

1996) ("The defendant must have "'reasonable cause to apprehend [such] danger from a direct

answer' to questions posed to him." (quoting *United States v. Neff*, 615 F.2d 1235, 1239 (9th

Cir.1980)).

Nor can Roark demonstrate that he was compelled to provide the testimony, much less

testimony that would be potentially incriminating.[13]  Roark has a choice of whether or not to

anchor in Richardson's Bay.  That he prefers to anchor there – as opposed to China Camp or other

areas in the San Francisco Bay because he has neighbors in Richardson's Bay that will keep an

eye on the Kittiwake while he is away – does not equate to being compelled to seek a Permit and

thereby make statements that might be false under penalty of perjury.  While a permit is required

under the RBRA Code and relevant regulations, he is not compelled to seek one sufficient to state

a potential claim under the Fifth Amendment's protection against self-incrimination.

Roark's Fifth Amendment – Self-Incrimination claim is DISMISSED without leave to

amend.

## VII.   FOURTH AMENDMENT

Defendants move to dismiss the claims asserted in his First and Eighth Causes of Action

that allege violations of the Fourth Amendment's prohibition on warrantless searches and seizures.

Roark asserts these claims based on two different theories.  First, Roark makes a facial challenge

to the Permit Application language requiring permittees to allow warrantless searches of permitted

vessels.  *See, e.g*., FAC ¶¶ 107-109.[14]  Second, he challenges the ability of RBRA to seize boats

---

[13] Roark does not admit it in his FAC, but presumably he is concerned that the affirmations he objects to in the Permit Application – affirming that his vessel has specific equipment and is seaworthy – would be proven objectively false.  *See* Dkt. No. 25-11 at ECF pg. 12-15 (Permit Application provisions objected to by Roark).

[14] Complaint ¶ 107: "The Permit Application violates the Fourth Amendment of the US Const.,

United States District Court
Northern District of California

subject to the 10-day Marine Debris Notices and the 72-hour Notice to Remove unpermitted boats. As applied to him, he challenges the posting of the Marine Debris Notice on his boat in June 2021 and the 72-hour Notice to Remove for failure to secure a permit posted in December 2022.  FAC ¶¶ 79, 139, 284-293, 308.

Defendants rely on a series of cases holding that certain commercial entities operating in "heavily regulated" industries can be searched without a warrant. [15]  *See, e.g., Killgore v. City of S. El Monte*, 3 F.4th 1186, 1189 (9th Cir. 2021). In order to qualify as a "heavily regulated industry," there must be something "inherent in the operation [that] poses a clear and significant risk to the public welfare."  *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 424 (2015).  A "warrantless inspection of a commercial business in a "closely regulated" industry is reasonable under the Fourth Amendment provided that three conditions are met: (1) 'there must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made'; (2) 'the warrantless inspections must be necessary to further [the] regulatory scheme'; and (3) 'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.'" *Killgore*, 3 F.4th at 1192 (quoting *New York v. Burger*, 482 U.S. 691, 702-03 (1987).  These cases are inapplicable.  No court has found that non-commercial permits allowing private vessels to anchor fall within or is akin to the "heavily regulated industries" that qualify for this exemption from the

_____

because it requires all people with boats in Richardson Bay to submit to warrantless searches of their home without probable cause of a crime being committed, without exigent circumstances, and at any time by the RBRA Harbor Administrator, who is not a certified peace officer." *Id.* ¶ 108: "The RBRA harbormaster is authorized to inspect the vessel at any time to enforce compliance with the permit. Any vessel this is found to be out of compliance with the conditions listed below may be cited, have its permit revoked" (citing Permit Application, Page 1).  *Id.* ¶ 109: "Furthermore, the anchoring permit application states if the "Harbormaster" "thinks" that the boat is "likely to create distress" in the future he can inspect the vessel… "*Emergency inspections of unattended vessels will be conducted whenever a vessel appears to be in, or is likely to create distress or potential to other vessels, real property or the environment*." (citing Permit Application, Page 2).

[15] Defendants also argue that Roark lacks standing to challenge the Permit Scheme, as he refuses to apply for a Permit.  However, Roark's alleges he has been encouraged to apply for a Permit, he submitted a Permit Application striking out the language he objects to, and RBRA is still requiring Permits to anchor for 30 days.  In these circumstances, Roark has standing to facially challenge the allegedly unconstitutional conditions imposed by the Permit Scheme.

United States District Court
Northern District of California

Fourth Amendment's warrant requirement.  *See Kilgore*, 3 F.4ᵗʰ at 1189 (identifying the few heavily or closely regulated industries that have been recognized by courts; sale of sporting weapons, stone quarrying and mining, [] automobile junkyards," "salmon fishing, commercial fishing, family day care homes, transportation of hazardous materials, veterinary drugs, foreign trade zones, [] commercial trucking," and massage parlors).

Roark's facial Fourth Amendment challenge fails for a different reason.  A long line of cases allow government officials to tow vehicles that pose safety or other public health hazards under the "community caretaking exception" to the Fourth Amendment's warrant requirement. *See, e.g.*, *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."); *Coal. on Homelessness v. City & Cnty. of San Francisco*, 93 Cal. App. 5th 928, 2023 WL 4673776 *6-7, 9 (2023) (discussing the vehicular community caretaking exception as covering "cars that are illegally parked, create a hazard to other drivers or an obstacle to the flow of traffic, or are a target for vandalism or theft," but concluding "tows of legally parked cars based on unpaid tickets are not within the vehicular community caretaking exception.").  This applies to the Permit Application provision, which allows for emergency inspections to determine whether a boat should be seized and removed in order to protect public health and safety is not facially unconstitutional.  *See* FAC ¶ 109 (citing Permit Application, page 2).  It does not impose an unconstitutional condition and does not violate the Fourth Amendment's prohibition on unreasonable searches when it conditions the Permit on allowing "Emergency inspections" of unattended vessels that may be in "distress."  Dkt. No. 25- at pg. 2.

With respect to the broader provision in the Permit that Roark challenges – giving the Harbor Master permission to inspect vessels "at any time to enforce compliance" with the Permit – that provision is not on its face limited to inspections necessary to protect public health or safety. But all of the requirements identified in the Permit Application concern the maintenance of the vessel and presence of equipment; those requirements are on their face related to health and safety. *See id*. at pg. 2-3.  Moreover, in order to bring a successful facial challenge, Roark must show that the Permitting Scheme and underlying RBRA's Code provisions that allow for inspections cannot

19

be constitutionally applied in any set of circumstances.  *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (explaining that a "facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.").  There are numerous circumstances identified on the face of the Permit Application – *e.g.*, "the vessel is in seaworthy condition and floats at all stages of the tide" and the "vessel's bilges are free from excessive accumulation of fuel, oil, coolant or other fluids, and the pumping equipment is operations" – that would support a community caretaking exception search.

Roark or another permittee may be able to challenge the search provisions of the Permit Scheme on an as-applied basis if the Harbor Master is unreasonably searching vessels with Permits.  But his facial challenge fails.

Roark's second Fourth Amendment challenge to the Marine Debris Notice and Notice to Remove Notices as warrantless seizures fails because the Notices themselves are on their face not seizures.  They provide owners the option of moving the boats to other anchorages within 10 days (for vessels determined to be marine debris) or within 72 hours (for vessels without a 30-day Permit).  Only if the vessels are not moved will there be a potential, subsequent seizure.[16]  Roark has not shown that there are no sets of circumstances where the vessels cannot properly be seized under either Notice in light of the RBRA Code provisions and Permit Applications giving the Harbor Master that authority.

As applied, there was no seizure here.  Roark was warned of possible seizures pursuant to the Notices unless he removed his boat from Richardson's Bay.  He did so in 2021 in response to the Marine Debris Notice.  He did not in response to the December 2022 Notice.  But providing notice of a possible seizure, if the vessel owner does not move his vessel, bring his vessel to seaworthy condition (*i.e.*, remediate the conditions causing the vessel to be considered marine debris), or secure a permit, does not equal a seizure under the Fourth Amendment.  *See, e.g.*, *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61 (1992) ("A 'seizure' of property, we have explained,

_____

[16] The due process protections regarding the posting of the Notices are discussed above.

occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

Roark's Fourth Amendment claims are DISMISSED without leave to amend.

## VIII.   EIGHTH AMENDMENT

In the Twelfth Cause of Action, Roark argues that the Permit Application requiring him to make affirmations concerning the condition of his vessel, and the RBRA Code's provisions that make repeated failures to comply with the Code requirements misdemeanors, "criminalize" Roark for living on his boat in violation of the Eighth Amendment.   FAC ¶¶ 336-346; *see also* RBRA Code § 1.04.050 ("Penalties").[17]  This claim fails.

Ninth Circuit caselaw holds that the Cruel and Unusual Punishment Clause of the Eighth Amendment "prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." *Martin v. City of Boise*, 920 F.3d 584, 616 (9th Cir. 2019).  In *Johnson v. City of Grants Pass*, 72 F.4th 868 (9th Cir. 2023), the Ninth Circuit clarified that a "local government cannot avoid this ruling by issuing civil citations that, later, become criminal offenses." *Id.* at 890.  But these cases do not confer upon individuals a right to shelter where they wish.  Instead, they hold that local governments cannot penalize homeless individuals, or criminally cite them for merely sleeping outdoors, unless the local governments offer the homeless an adequate place to shelter, *e.g.*, an indoor shelter bed or an alternative campsite.  *See Martin*, 920 F.3d at 617.

This line of cases does not support Roark's claim that the Permit Scheme and Code provisions regarding penalties violate the Eighth Amendment by threatening criminal sanctions for repeated violations.  The Permit Scheme and Code require vessels to be seaworthy and possess equipment, in order to protect the public health and safety.  Enforcement of those provisions does not criminalize Roark's use of his boat as his home.  Nor do the requirements that individuals must secure a permit to anchor more than 72-hours.  As noted above, courts have upheld the right

---

[17] The Eleventh Cause of Action refers to cruel and unusual punishment and the Eighth Amendment, but the allegations regard an alleged denial of substantive due process rights and Roark's boat being unfairly targeted for destruction through CDBW grants.  Those arguments are addressed above.

1   of local agencies to enforce permit schemes for any vessels anchoring in excess of 72-hours.

2   *Barber v. State of Hawai'i*, 42 F.3d 1185 (9th Cir. 1994); *Graf v. San Diego Unified Port Dist.*,

3   205 Cal. App. 3d 1189 (Cal. Ct. App. 1988).  And I have also rejected in Section VI, above, the

4   argument that Roark's privilege against self-incrimination is violated by requiring individuals to

5   declare that their boats comply with the RBRA's Code provisions in order to secure a Permit.

6         Roark's claim under the Eighth Amendment is DISMISSED without leave to amend.

7   **IX.    STATE-CREATED DANGER & NEGLIGENCE**

8         In his Ninth and part of his Tenth Cause of Action, Roark argues that defendants violated

9   the state-created danger doctrine when they posted the Marine Debris Notice on the Kittiwake in

10  June 2021, threatening to seize Roark's boat.  He alleges that the Notice forced him to leave

11  Richardson's Bay, despite defendants "knowing" that Richardson's Bay was the "safest place to

12  anchor in the San Francisco Bay" and that he had no other place to anchor his boat.  He contends

13  that unserved defendant Havel (a former RBRA Harbor Master) "instructed" Roark to anchor at

14  China Camp, knowing that anchoring there was more dangerous given the cross currents and that

15  there were no neighbors there to keep a watch on the Kittiwake.  Despite these known dangers,

16  Roark alleges that defendants "forced" him to move and anchor at China Camp where he was

17  subsequently damaged when the boat was burglarized and set adrift in November 2022.  FAC ¶¶

18  76, 294-307, 313-319.  He claims that he was again placed in "state-created danger" when

19  Malcom issued the December 2022 Notice to Remove for failure to secure a permit, and continues

20  to be at risk by the conduct of new Harbor Master and unserved defendants Brad Gross and Anne

21  Luger (the Deputy Harbor Master) by their attempt to enforce the Permit Scheme.  *Id.* ¶¶ 308-311.

22        To state a substantive due process claim based on the state-created danger doctrine, Roark

23  must establish that: (1) "the officers' affirmative actions created or exposed h[im] to actual,

24  particularized danger that []he would not otherwise have faced"; (2) "the injury was foreseeable";

25  and (3) "the officers were deliberately indifferent to the known danger." *Martinez v. City of*

26  *Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019). The third element, deliberate indifference, requires

27  "proof that a municipal actor disregarded a known or obvious consequence of his action" which is

28  "a stringent standard of fault." *Id.* at 1274 (quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th

United States District Court
Northern District of California

Cir. 2011)). "[I]t requires a 'culpable mental state.'" *Id.* (quoting *Patel*, 648 F.3d at 974).  In other words, plaintiff must allege plausible facts showing that the defendant "recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks without regard to the consequences to the plaintiff." *L.W. v. Grubbs*, 92 F.3d 894, 899 (9th Cir. 1996) (internal quotation omitted).

To start, the only affirmative actions alleged to support a "state-created danger" were the posting of the Marine Debris Notice in June 2021 and the 72-hour Notice to Remove posted in December 2022.  The posting of those Notices could not have exposed Roark to "actual, particularized danger," however, because Roark – who had no permit for anchoring in Richardson's Bay and no entitlement or right to anchor there – was not forced by those Notices to move his boat to any particular place.  Roark admits that he had lived in a Marina for 20 years and that he had been able to secure private anchoring options.  FAC ¶ 49.  Just because he preferred to anchor in Richardson's Bay does not mean that the RBRA cannot either require him to secure a permit or move his boat.  *See, e.g., DeShaney v. Winnebago County of Department of Social Services*, 489 U.S. 189, 200 (1989) ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.").

The dangers Roark alleges that he faced when moving to China Camp – purportedly at the suggestion of the former Harbor Master – were the need to address the stronger currents there and the more difficult access to and from land.  Roark also alleges a greater danger of theft of skiffs and threats of vandalism to his boat because, unlike in Richardson's Bay, Roark did not have friends to watch over his boat while he was away working in a different county when moored at China Camp.  *Id.* ¶¶ 192, 301-306.  These alleged dangers do not rise to the level of serious, particularized, *foreseeable* risk of dangers to Roark's life or liberty to which the Harbor Master intended to expose Roark that he would have not otherwise have faced had he remained in Richardson's Bay.

Even assuming that the former Harbor Master "directed" him to China Camp, Roark did not have to go there.  The dangers that Roark faced and suffered (the stealing of his skiff and

United States District Court
Northern District of California

United States District Court
Northern District of California

1    vandalism of his boat) were caused by third-parties; he does not allege any facts that could

2    plausibly show that the former Harbor Master knew or should have expected that Roark would

3    suffer those particularized forms of damage at the hands of unknown third-parties.[18]  The level of

4    harm alleged simply does not rise to the level of harm recognized in the case law to plausibly

5    support a state-created danger claim.  *See, e.g., Reed v. City of Emeryville*, 568 F. Supp. 3d 1029,

6    1040–41 (N.D. Cal. 2021) (identifying cases rejecting state-created danger theory where homeless

7    individuals were forced to leave an encampment for a congregate shelter, absent allegations that

8    evictions were occurring during "precarious weather" or during the height of the COVID-19

9    pandemic; allowing claims to continue based on allegations that homeless encampment

10   demolitions were timed to occur at "onset of the winter months" where city did not offer

11   adequately congregate shelter beds); *see also Sacramento Homeless Union v. County of*

12   *Sacramento*, No. 222CV01095TLNKJN, 2023 WL 5280238, at *2 (E.D. Cal. Aug. 16, 2023)

13   (state created danger claim plausible where eviction "places unhoused individuals at an increased

14   risk of the 'known and obvious danger' of exposure to extreme heat.").

15          Relatedly, Roark alleges in his Thirteenth Cause of Action that the posting of the Marine

16   Debris Notice on his boat in June 2021 and former Harbor Master Havel "directing" him to China

17   Camp was negligent and knowingly exposed him to dangers.  Those dangers materialized when

18   Roark's boat was vandalized, given the lack of neighbors at China Camp who could watch over

19   his boat as his neighbors in Richardson's Bay do.  FAC ¶¶ 347-353.  He also complains that the

20   continued "threats" that the current Harbor Master (Gross) will issue future Notices to Remove

21   negligently continue to place him in danger.  *Id*. ¶¶ 354-360.

22

23

_____

24   [18] Any such allegation is undermined by Roark voluntarily remaining anchored at China Camp
     from June 2021 through November 2022. FAC ¶¶ 72, 75, 76, 79.  That, by itself, shows the
25   implausibility that the dangers Roark alleges were likely or foreseeable to the RBRA officials who
     posted the Notices in June 2021 and December 2022.  Defendants argue that Roark admitted in his
26   original Complaint that he left for China Camp in 2019, but changed that date to June 2021 in his
     FAC to avoid the three year statute of limitations for maritime negligence and two year statute of
27   limitations for Section 1983 state created danger.  *See* Mot. at 14 n.10.  I assume for purposes of
     this Order that the Marine Debris Notice was posted, and Roark left for China Camp, in June
28   2021.

24

The negligence claim fails for the same reasons the state-created danger claim fails.[19]  It was Roark's decision to move his boat to China Camp when faced with the Marine Debris Notice, whether or not Havel "directed" him to do so.  He remained there for at least eighteen months, from June 2021 through November 2022.  FAC ¶¶ 72, 75, 76, 79.  Any damages he suffered during that time (from stolen skiffs and vandalism) were caused by third parties and not by any of the defendants.  FAC ¶¶ 27, 76, 188, 192.  Even if Roark could allege facts showing that the former Harbor Master owed Roark a duty, as required for this claim, there are no facts alleged plausibly showing that the conduct of those third parties should have or even could have been known to the former Harbor Master.  Proximate cause cannot be alleged based on Roark's own admissions.  *See Steinle v. United States*, 17 F.4th 819, 824 (9th Cir. 2021) (rejecting proximate cause as a matter of California law where the injury had only a "tenuous connection" to the government officials conduct, and the damage was caused by the "the criminal and negligent actions of at least two other people intervened between those two events" over the course of "several days").

Roark's Ninth and Thirteenth Causes of Action are DISMISSED without leave to amend.

## X.   CONSTITUTIONAL CONSPIRACY AND RELATED CLAIMS

Roark's Second and part of (first) Third Causes of Action are for "Civil Conspiracy" in violation of 42 U.S.C. section 1985.[20]  Roark brings the conspiracy claims against a dozen different defendants, the majority of whom have not appeared in this case and do not appear to have been served, alleging a vast conspiracy between: RBRA; the Bay Conservation and Development Commission ("BCDC") and its past or present members/directors; current and past employees or officers of RBRA; Regional Government Services ("RGS," a "quasi public/private consulting firm); two other consulting firms; and the County of Marin and its county administrator.  Roark generally alleges that the named individuals and entities conspired to pass

---

[19]  "To establish a negligence claim under general maritime law, the basic elements are similar to those required for a common law claim of negligence: 'a duty, a breach of the duty, proximate cause, and damages.'" *Shaw v. United States*, 436 F. Supp. 3d 1315, 1327 (N.D. Cal. 2020) (quoting *Prince v. Thomas*, 25 F. Supp. 2d 1045, 1047 (N.D. Cal. 1997)).

[20] Roark's FAC contains two conspiracy based Third Causes of Action.  *See* FAC ¶ 161 & ¶ 175.

1    ordinances and make plans to remove vessels from Richardson's Bay and obtain grants from state

2    and federal agencies through false statements to accomplish that goal of destroying private

3    property.  FAC ¶¶ 147-160 (Second Cause of Action); ¶¶ 161-174 (first Third Cause of Action).

4         Roark's second "Third Cause of Action" for "Conspiracy to Deprive Civil Rights" is

5    asserted against unserved defendants Regional Government Services (RGS), Brad Gross, Anne

6    Luger, County of Marin, Marin County Administrator Daniel Eilerman, as well as against

7    McGrath (who appeared to oppose the motion for a preliminary injunction).  FAC ¶¶ 161-174.

8    The only facts alleged in this cause of action regard the conduct of "Ms. Scwartz Lesberg" who is

9    alleged to have conducted a flawed and fraudulent study in 2018-2019 regarding eelgrass in

10   Richardson's Bay in order to enrich herself (through "hundreds of thousands of dollars of grant

11   funding") and causing destruction of boats anchored in Richardson's Bay.  *Id*. ¶¶ 165-174; *see*

12   *also id*. ¶¶ 35-36.  Lesberg has not been served.  The allegations regarding Lesberg's flawed

13   research and studies, and submission of the same to fraudulently secure grants from NOAA, are

14   repeated in the Fifth Cause of Action for violation of substantive due process under 41 U.S.C.

15   sections 1983 and 1985.  FAC ¶¶ 235-259.

16        Roark's Fourteenth Cause of Action is for conspiracy in violation of 42 U.S.C. section

17   1985, challenging the Bay Conservation Development Commission's ("BCDC") creation of the

18   RBRA and BCDC's plan in conjunction with RBRA to seize and destroy vessels as marine debris

19   with monies fraudulently secured from state and federal agencies.  FAC ¶¶ 373-388.

20        Each of Roark's conspiracy claims based on Section 1985 fail.  To bring a cause of action

21   successfully under § 1985(3), a plaintiff must demonstrate a deprivation of a right motivated by

22   "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the

23   conspirators' action." *Sever v. Alaska Pulp Corp*., 978 F.2d 1529, 1536 (9th Cir.1992); *see also id*.

24   at 1526-38 (examples of categories of racial or class-based animus recognized by courts to support

25   a section 1985 claim, including animus based on race and gender).  The Supreme Court has held,

26   however, that "group actions generally resting on economic motivations should be deemed beyond

27   the reach of § 1985(3)." *United Bhd. of Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 839

28   (1983).  Roark has not alleged that he is a member of any recognized protected or quasi-protected

United States District Court
Northern District of California

class.  His Second, Third (first and second), and Fourteenth Causes of Action are DISMISSED without leave to amend.

## XI.   PUBLIC CONTRACT CODE

Roark's Fourth Cause of Action asserts a claim for violation of "Public Contract Code § 10411" against unserved defendants Beth Pollard and Curtis Havel.  The moving defendants (RBRA and Malcom) do not address this claim.  Section 10411 prohibits former public employees from entering into contracts with government agencies where the individual played some role in planning or negotiating the contract while still a public employee.[21]  Roark alleges that Pollard left her employment as RBRA's Executive Director and was then hired by Havel (the then, but now former, RBRA Harbor Master) to be a consultant to help Havel secure funds for RBRA's boat removal program from NOAA, CDBW, and others.  He also contends that Havel used his RBRA office to "ingratiate himself" with his future employer, Clipper Harbor marina.  Roark generally claims that Pollard and Havel submitted fraudulent reports and claims to CDBW to secure funds to destroy his boat.  FAC ¶¶ 201-234.

Neither RBRA nor any of the individual defendants who appeared in this action are named as defendants under this cause of action.  More problematic is that this claim must be brought in Superior Court.  *See* Cal. Pub. Cont. Code § 10421 ("The state, or any person acting on behalf of the state, may bring a civil action seeking a determination by the Superior Court.").

---

[21] § 10411 provides: "Conflict of interest; retired, dismissed, separated or former state employees; time prohibition

(a) No retired, dismissed, separated, or formerly employed person of any state agency or department employed under the state civil service or otherwise appointed to serve in state government may enter into a contract in which he or she engaged in any of the negotiations, transactions, planning, arrangements, or any part of the decisionmaking process relevant to the contract while employed in any capacity by any state agency or department. The prohibition of this subdivision shall apply to a person only during the two-year period beginning on the date the person left state employment.
(b) For a period of 12 months following the date of his or her retirement, dismissal, or separation from state service, no person employed under state civil service or otherwise appointed to serve in state government may enter into a contract with any state agency, if he or she was employed by that state agency in a policymaking position in the same general subject area as the proposed contract within the 12-month period prior to his or her retirement, dismissal, or separation. The prohibition of this subdivision shall not apply to a contract requiring the person's services as an expert witness in a civil case or to a contract for the continuation of an attorney's services on a matter with which he or she was involved prior to leaving state service.

United States District Court
Northern District of California

The Public Contract Code claim is DISMISSED for lack of jurisdiction without leave to amend.

## XII.   BANE ACT

In his Sixteenth (first) Cause of Action Roark argues that the defendants violated California's Bane Act when they threatened to seize and destroy his boat (his home) – a threat that exposed Roark to serious bodily injury and death and amounts to "serious violence" in order to deprive him of his constitutional rights.[22]

Section 52.1 of the California Civil Code, also known as the Bane Act, creates a right of action against any person who "interferes by threat, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or . . . of this state." Cal. Civ. Code § 52.1(a).  In *Shoyoye v. Cnty. of Los Angeles*, 203 Cal. App. 4th 947 (2012), the court clarified that the Bane Act "was intended to address only egregious interferences with constitutional rights, not just any tort. The act of interference with a constitutional right must itself be deliberate or spiteful." *Id*. at 959.  The court also explained that the statute requires a showing of coercion independent from the coercion "inherent" in the constitutional deprivation.  *Id*. at 962.  Courts have pointed out that the constitutional deprivation in *Shoyoye* – wrongful incarceration – was due to an error and not intentional conduct, hence the need to show some form of coercion, intimidation, or harassment independent from the act alleged to have violated the victim's constitutional right.  *See, e.g., Jones v. Cty. of Contra Costa,* No. 13-CV-05552-TEH, 2016 WL 1569974, at *6 (N.D. Cal. Apr. 19, 2016); *see also Sandoval v. Cty. of Sonoma*, No. 11-CV-05817-TEH, 2016 WL 612905, at *3 (N.D. Cal. Feb. 16, 2016) (where the constitutional deprivation was an unlawful search and seizure, the court followed *Lyall v. City of Los Angeles*, 807 F.3d 1178 (9th Cir. 2015) held "that a Bane Act search and seizure claim requires threats, intimidation or coercion separate from the coercion inherent in the search and seizure itself.").

There are two problems with Roark's Bane Act claim.  First, as demonstrated throughout

---

[22] In the FAC, Roark has two Sixteenth Causes of Action.

United States District Court
Northern District of California

United States District Court
Northern District of California

this Order, he has not successfully alleged a constitutional violation.  Second, even if Roark had alleged a constitutional violation, he would need to allege coercion or intimidation independent from the alleged constitutional violation.   He has not done so.

The Bane Act claims is DISMISSED without leave to amend.

## XIII.   CAL. CODE OF CIVIL PROCEDURE SECTION 1085

In his (second) Sixteenth Cause of Action, Roark relies on Cal. Code of  Civ. Proc. section 1085 – a provision allow a court to grant a writ to compel public entities to perform acts which California law requires them to perform – to argue that defendants must be ordered to return the $70,000 they fraudulently secured from CDBW to destroy the Kittiwake. FAC ¶¶ 418-431. Section 1085 is inapplicable on these facts.

"Code of Civil Procedure section 1085, providing for writs of mandate, is available to compel public agencies to perform acts required by law. [Citation.] To obtain relief, a petitioner must demonstrate (1) no 'plain, speedy, and adequate' alternative remedy exists [citation]; (2) " 'a clear, present, ... ministerial duty on the part of the respondent' "; and (3) a correlative " 'clear, present, and beneficial right in the petitioner to the performance of that duty.' " " *People v. Picklesimer*, 48 Cal.4th 330, 339-340 (2010).

Roark points to no "ministerial duty" that defendants owe to CDBW in connection with the CBDW Grant Agreements.  Compl., Exs. A&B.  Deciding what vessels to list in the grant agreements – that the RBRA considers to be abandoned *or* that might be willing to be voluntarily "surrendered" – is on its face a discretionary act, not a ministerial act.  And Roark has no "beneficial interest" in the grant agreements that provide funds for the removal and destruction of abandoned vessels or voluntarily surrendered vessels.  *See e.g., Save the Plastic Bag Coalition v. City of Manhattan Beach*, 52 Cal.4th 155, 165 (2011) ("'The requirement that a petitioner be "beneficially interested" has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.'").

The Section 1085 claim is DISMISSED without leave to amend.

## XIV.   TAXPAYER ACTION

Roark's Nineteenth Cause of Action seeks to hold RBRA liable under California Civil Code section 526a for defendants' conduct in falsely representing to CDBW that Roark's boat was marine debris and securing $70,000 from CDBW to destroy the boat.  FAC ¶¶ 409-417.

Section 526a "establishes the right of a taxpayer plaintiff to maintain an action against any officer of a local agency to obtain a judgment restraining or preventing illegal expenditure, waste, or injury of the estate, funds, or property of said agency."  *Schmid v. City & Cnty. of San Francisco*, 60 Cal. App. 5th 470, 495 (2021).[23]  However, "[a] claim under this statute does not lie to attack exercises of administrative discretion and may not be employed to interfere with policymaking."  *Schmid v. City & Cnty. of San Francisco*, 60 Cal. App. 5th 470, 495–96 (2021); *see also San Bernardino County v. Superior Court*, 239 Cal.App.4th 679, 686 (2015) ("[T]axpayer suits are authorized only if the government body has a duty to act and has refused to do so. If it has discretion and chooses not to act, the courts may not interfere with that decision." (internal quotation omitted); *Humane Society of the United States v. State Bd. of Equalization*, 152 Cal.App.4th 349, 356 (2007) ("[S]ection 526a has its limits. In particular, the courts have stressed

---

[23] Cal. Civil Code section § 526a provides in relevant part:  "Actions against officers; scope of section; municipal bonds:

> (a) An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax that funds the defendant local agency, including, but not limited to, the following:
>> (1) An income tax.
>> (2) A sales and use tax or transaction and use tax initially paid by a consumer to a retailer.
>> (3) A property tax, including a property tax paid by a tenant or lessee to a landlord or lessor pursuant to the terms of a written lease.
>> (4) A business license tax.
> (b) This section does not affect any right of action in favor of a local agency, or any public officer; provided, that no injunction shall be granted restraining the offering for sale, sale, or issuance of any municipal bonds for public improvements or public utilities.
> (c) An action brought pursuant to this section to enjoin a public improvement project shall take special precedence over all civil matters on the calendar of the court except those matters to which equal precedence on the calendar is granted by law.
> (d) For purposes of this section, the following definitions apply:
>> (1) "Local agency" means a city, town, county, or city and county, or a district, public authority, or any other political subdivision in the state.
>> (2) "Resident" means a person who lives, works, owns property, or attends school in the jurisdiction of the defendant local agency.

United States District Court
Northern District of California

1  that the statute should not be applied to principally 'political' issues or issues involving the

2  exercise of the discretion of either the legislative or executive branches of government.").  Under a

3        As shown by the exhibits attached to Roark's complaint, the CDBW grants that he

4  complains about are "agreements" and "certificates of funding" that provide funds for

5  "reimbursement" of expenses the agency actually expends to remove and dispose of abandoned or

6  surrendered vessels.  Dkt. 25-1 at §§ 1, 24.  While the Kittiwake is listed on the grant applications

7  as part of the "scope of work," Roark cannot state a claim based on section 525a  because the

8  inclusion of the Kittiwake on the list is the result of the discretionary determination by RBRA that

9  the Kittiwake might be abandoned or voluntarily surrendered.  Even assuming Roark overcame the

10  discretion inherent in the grant agreement, absent the seizure and destruction of the Kittiwake and

11  then RBRA's application for *reimbursement* of those costs from the CDBW grant, there is no

12  expenditure from the state to "restrain[] or prevent[]."

13        Roark's Nineteenth Cause of Action for violation of Civil Code section 526a is

14  DISMISSED without leave to amend.

15  **CONCLUSION**

16        Having addressed each possible claim alleged in Roark's Amended Complaint, each claim

17  is DISMISSED without leave to amend.  The defects identified above that lead to dismissal as a

18  matter of law cannot be cured by alleging further facts.  Based on inapplicable legal theories or on

19  facts he has admitted, each claim fails.

20        **IT IS SO ORDERED.**

21  Dated: December 1, 2023

22

23  William H. Orrick
    United States District Judge

24

25

26

27

28